UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF KENTUCKY
CENTRAL DIVISION
LEXINGTON

| | | |
|---|---|---|
| JACOB BLEVINS, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | No. 5:18-CV-190-REW |
| v. | ) | |
| | ) | |
| EASTERN KENTUCKY UNIVERSITY, | ) | OPINION AND ORDER |
| et al., | ) | |
| | ) | |
| Defendants. | ) | |

\*\*\* \*\*\* \*\*\* \*\*\*

Defendants Eastern Kentucky University (EKU) and EKU employees Jacquelyn Pegram and Bethanie Gamble (both individually and officially) seek summary judgment on all claims in this case. DE #35. Plaintiff Jacob Blevins, a former EKU nursing student, opposes the motion in part. DE #41. Defendants replied (DE #43) and subsequently submitted a notice of relevant supplemental authority (DE #44), to which Plaintiff responded (DE #45). The matter is fully briefed and ripe for review. For the reasons discussed, the Court grants summary judgment in favor of Defendants on all claims.

1. **Relevant Factual and Procedural Background**

This case centers on Blevins's disagreement with a failing grade he received while enrolled in EKU's nursing program and the process he received in challenging it. Many of the facts presented—in the dispositive motion briefing, deposition portions in the record, and the Complaint itself—bear on whether Blevins *deserved* the failing grade. But the Court's role is not to evaluate whether the grade awarded, or the outcome achieved, was substantively appropriate; the judicial

1

function is limited to deciding whether facts material to the asserted constitutional and tort claims are genuinely in dispute. The Court streamlines its factual recitation accordingly.

Plaintiff began taking classes at EKU in 2012, focusing on pre-nursing studies, and enrolled in EKU's Associate Degree in Nursing (ADN) Program in 2015.[1] DE ##35-1 (Transcript), 35-2 (ADN Application). For the Spring 2017 semester, Blevins enrolled in the Nursing 232 and 234 courses; each carried a lecture and a clinical rotation component (NUR 232 / NUR 232C and NUR 234 / NUR 234C, respectively). DE #35-1 at 6. The courses included both adult and pediatric sections, and Jacquelyn Pegram (a nurse practitioner by trade) taught the pediatric portions of both courses. DE #41-15 (Pegram Dep.) at 2; DE #35-8 (Pegram Dep.) at 3.[2] Both sides agree that Pegram took issue with Blevins's communication skills and professionalism from the outset of their academic relationship.[3]

### A. March 20 Toradol Incident

On March 20, 2017, Blevins attended his second clinical under Pegram's supervision at the University of Kentucky (UK) Children's Hospital. DE #35-8 (Pegram Dep.) at 5; DE #35-9 (Blevins Dep.) at 7–8. He was assigned solely to pediatric patient W.M., a 15-year-old male

---

[1] Following withdrawal from a required course, Blevins later reapplied and was readmitted to EKU's ADN Program in 2016. *See* DE #35-3 (Application for Readmission).

[2] The parties attach differing sections of depositions to their filings, as they deem relevant. The Court has fully reviewed and considered all dispositive motion briefing attachments, including the various deposition excerpts, and synthesizes them for purposes of the instant fact summary. All deposition citations refer to the CM/ECF pagination.

[3] After Pegram criticized perceived unprofessionalism that Blevins displayed at a clinical, Blevins arranged a March 7, 2017 meeting with program Chairman Bethanie Gamble to discuss his interactions with Pegram. *See* DE #35-10 at 3–5. Blevins characterized the tension between them as a personality conflict, while Gamble observed a pattern of unprofessional communication throughout prior clinical rotation critiques and advised Blevins to work with Pegram to understand and adhere to appropriately professional conduct standards. DE #35-11 (Gamble's 3/7/2017 Meeting Notes). Blevins ultimately, on March 21, apologized to Pegram for any negative first impression made. DE #35-10 at 5.

recovering from an emergency appendectomy. DE #41-19 (W.M. Aff.).[4] Blevins arrived at the UK pediatric unit around 11:00 a.m. and, after Pegram's preclinical medical lecture to the full student group, began working independently with W.M. around 1:00 p.m. DE #35-9 (Blevins Dep.) at 7. Per Blevins, Pegram checked on him occasionally throughout the day to see if he needed assistance, and he experienced no negative interactions with her. *Id.* Around 6:00 p.m., Pegram directed Blevins to administer a dose of Toradol (a nonsteroidal anti-inflammatory drug, or "NSAID") to W.M. via intravenous (IV) injection. *Id.* at 7–8. Before medication administration, Pegram and Blevins discussed the applicable procedure. *Id.* at 8. Blevins identified the correct steps (including the need for a "slow push" into the IV) and asked whether he should dilute the medication, as he had previously been instructed; Pegram directed him not to dilute the Toradol for W.M., noting that pediatric patients differ from adults. *Id.* Pegram did not specify the intended duration of the push, but she relied on the meaning baked into the EKU training rubric, which she testified was 3-5 minutes. *See* DE #35-8 (Pegram Dep.) at 6. Blevins, without dispute, knew the push was to be slow but denied specific knowledge of what that adjective meant. *See* DE #35-9 at 8. After confirming the process, Pegram drew up the medication in the syringe.[5] *Id.*

The pair then entered W.M.'s room.[6] *Id.* After prepping the injection site and completing a required saline flush, Blevins administered the Toradol, at what he considered an appropriately

---

[4] The Court adopts the parties' practice of using W.M.'s initials but notes that his name already appears in full, unredacted, at various places in the record. *See, e.g.*, DE #35-8 at 9; DE #41-5 at 2. The parties have not sought sealing or attempted to file redacted versions of the applicable documents, and the Court sees no basis for sealing them now, *sua sponte*.

[5] Later documentation states that Blevins himself "drew up [the] medication correctly." DE #41-7; *see also* DE #35-8 at 12 (Pegram testifying to her memory of Blevins preparing the medication). Blevins disagrees, maintaining that Pegram prepared it. The distinction is irrelevant, for purposes of this case, but the Court accepts Blevins's version of events.

[6] Per Blevins, Pegram lingered at the entrance to the room, rather than accompanying Blevins directly to W.M.'s bedside. *See* DE #41-19 at 3.

slow speed. *Id.* ("I pushed it, which—what I thought was slow, but I was never told a[n] actual time to push. I was just told go slow, so that's what I did. I went slow off of 1 milliliter of Toradol in a 10CC syringe."). The parties dispute whether Pegram, during Blevins's Toradol administration, again directed Blevins to "slow down." *Compare id.* ("Did Ms. Pegram ever tell you, while you're doing medication, anything like stop, slow down, go slower, anything at all, words to that effect? No. She [ ] states that she said repeatedly 'slow down' multiple times, but if I'm doing a 1 milliliter push in a 10CC syringe, how can I rapidly push the medication, and you tell me to slow down multiple times? If I rapidly push a medication, it's gone. It's immediately gone. Especially 1 milliliter, that much, it's gone.")[7] *with* DE #35-6 (Pegram Dep.) at 7 ("He was told to give it [a] slow push. During the medication he was told to slow down, go slow, slow, slow because we had a break in between the medication and the push and at that time he pushed it faster than what he was before.").[8] The records supports that the push took around six seconds. *See* DE #35-9 (Blevins Dep.) at 12. During the Toradol administration, W.M. complained of pain, *see* DE #35-9 (Blevins Dep.) at 8 ("He said, 'Ouch, that burns a little bit.' . . .  And then 'my eyes are watering.'"), but Pegram observed no apparent physical injury to the patient, *see* DE #35-8

---

[7] Pegram testified that she recalled Blevins using a syringe smaller than 10CC. DE #35-8 at 13.

[8] The affidavit from W.M. supports Blevins's take. *See* DE #41-19 at 3 (W.M. Aff.) ("Not once did [Pegram] criticize how Jacob did his job, or tell him to 'go slower.'"). Pegram's report explaining Blevins's ultimate failing grade, however, cited Blevins's perceived failure to follow her instructions during medication administration. *See* DE #41-7 at 2 ("Jacob was instructed multiple times to 'slow down' by me, the clinical instructor, but continued to rapidly push medication into peripheral IV.). The Court does not weigh the competing proof; for instant purposes, it assumes that Blevins's adequately supported factual representations are accurate. Regardless, as discussed *infra*, the precise timing of Pegram's instruction to slowly push the medication does not materially bear on the relevant legal determinations. There is no dispute that Blevins reviewed with Pegram, and was aware of, the general "slow push" requirement at some point prior to the Toradol administration, or that Pegram personally judged the injection faster than appropriate and noncompliant with what she believed Blevins should have considered properly "slow" under the circumstances and per her previous instructions. Also legally immaterial is the parties' debate concerning the actual proper push speed.

(Pegram Dep.) at 5. Pegram neither returned to further assess W.M. nor interacted with Blevins for the remainder of the clinical shift, which ended approximately thirty minutes after the Toradol administration. DE #35-9 at 8; DE #35-8 at 13–14.

### B. Blevins's "Unsafe" Grade in NUR 232C

Pegram testified that she "was in shock" after witnessing Blevins administer the Toradol at what she believed to be an unreasonably fast pace, despite her previous instruction to apply a "slow push." DE #35-8 at 13. That evening (March 20, 2017), Pegram (herself a first-year instructor) discussed the incident with Professor Alice Potts, a veteran instructor who had supervised Blevins in a prior clinical rotation (NUR 234C) and previously approved Blevins's ability to administer medication. *Id.* at 9; DE #35-7 (Potts Dep.) at 5. Potts confirmed that Blevins had received proper education regarding medication administration and recommended treating the incident as a teachable moment and requiring Blevins to spend additional time practicing in the lab. DE #35-8 at 9. That same night, Pegram also consulted with Professor Kristina Petrey, the course coordinator for both NUR 232/232C and NUR 234/234C. DE #35-12 (Petrey Dep.) at 3–4; DE #35-8 (Pegram Dep.) at 9–10. After Pegram explained her perception of the Toradol incident and expressed her concerns to Petrey, Petrey advised that, if Pegram thought that Blevins's conduct was unsafe from a nursing standpoint, she should give Blevins an "unsafe" grade in the clinical course. DE #35-12 at 6 ("And in my recollection I remember saying do you consider this to be an unsafe behavior? And she said, yes, it is. And then I said then you have your answer. If it's unsafe to you as a nurse, then it's unsafe.").[9] Pegram heavily weighed Petrey's input, given Petrey's role

---

[9] Per Petrey, Pegram informed her that W.M. was not harmed, but did not address whether she considered him at risk of harm under the circumstances. *Id.* at 5 ("[Pegram] [s]aid the student drew the medication up and they performed the skill, but they pushed it excessively fast. Rapidly or too fast, however she worded that. I asked because at the core of everything I'm a nurse, how's the patient? . . . She said that the patient to the best of her knowledge had not had any ill consequences

as course coordinator. DE #35-8 at 10 (" . . . What did Ms. Petrey say? . . . She said he was clinically unsafe because he did not follow a clinical instruction."); *id.* (emphasizing that the opinion of Petrey, as Pegram's "boss[,]" was of particular importance and stating: "That's what [Petrey] said, that it was unsafe. I didn't even know what clinical unsafe meant."). Pegram had walked out of the clinic disturbed but unsure of the proper course. She deliberated and sought counsel from peers and the faculty hierarchy.

The next day, Pegram met with Gamble, Petrey, and colleague Connie Hubbard (a fellow EKU ADN professor) to discuss the March 20 incident with Blevins.[10] DE #35-6 (Pegram Dep.) at 3–4. The three discussed the Toradol situation and evaluated the options available to Pegram. *Id.* at 4 ("We were putting it all out and deciding where to go from there."). Ultimately, Pegram felt that Blevins's clinical conduct—namely, his failure to follow her drug administration instructions—was unsafe and warranted such a grade. *Id.* at 5 ("Couldn't you have given him . . . an unsatisfactory? It was an unsafe. It was blatantly unsafe.); *id.* at 6 ("Why did you have to [assign the unsafe]? Because it was unsafe behavior. It was an unsafe event. It is unsafe."); *id.* ("Based on my judgment he was unsafe.").[11]

---

at that time."); *id.* at 6 ("[M]y question to her was the patient physically harmed. Not were they endangered. Because endanger doesn't mean harm. Endanger means potential for harm."). Pegram likewise testified that she perceived potential for harm, but W.M. ultimately suffered no lasting harm from the incident. *See* DE #35-8 at 5 (Pegram observing that, in her view, Blevins's March 20 Toradol injection created "potential for injury[,]" but she could not confirm that any injury actually occurred).

[10] Per Chairman Gamble, Petrey and Hubbard were both made available as mentors to Pegram. DE #41-2 (Gamble Dep.) at 4.

[11] Pegram testified that the only reason she considered treating the Toradol incident as a teachable moment, rather than assigning Blevins an "unsafe" grade, was because she feared him and his reaction. DE #35-6 at 4 ("I would think it would be teachable only because I was scared to death to kick him out of the program[,] to mark him unsafe[,] [that] would be the only reason I would do a teachable moment . . . I was terrified to the point I quit my job, sold my house."); *id.* at 3 ("Not because I necessarily thought it would be as teachable. I was more concerned about the harm it would cause by doing an unsafe . . . I was worried about Jacob Blevins's reaction to an unsafe . . .

Pegram, out for a stretch with the flu, subsequently worked with Hubbard to craft a written report concerning Blevins's "unsafe" grade. DE #35-13 (Hubbard Dep.) at 3–4. Per Pegram, Hubbard advised that a failure to follow a clinical instructor's direction would warrant an "unsafe" grade for that rotation. DE #35-8 at 10 ("She explained it to me as if a student does not follow clinical instruction that they are clinically unsafe."). Hubbard clarified, though, that—while she helped Pegram assess the situation and weigh her options—the grading decision was ultimately Pegram's judgment call. DE #35-13 at 4 ("Because I had been there for a longer period of time than Ms. Pegram, and there had been issues that she was concerned about with [Blevins] in clinical, she asked me to be with her to listen to what the concerns were and just to help her to decide, not decide, help her to develop whatever document she was going to because she was new faculty and had not had the experience of giving anything but a satisfactory . . . Based on what [Pegram] said, then she would make the decision of what to do with that event. But I just talked her through this is the policy, this is what we have, it's now your decision, did this fit this criteria or that criteria. So it was someone to help be a sounding board."). Together, Pegram and Hubbard drafted a report memorializing the reasons for identifying Blevins as "unsafe" in the 232C course. DE #35-6 at 6; *see* DE ## 35-14 & 41-7 (Clinical "Unsafe" Report) (describing the March 20, 2017 Toradol incident and concluding that Blevins did not demonstrate "safety and competency" because he "[d]id not follow clinical instructor guidelines while giving the medication").

---

I was scared of him."). Pegram's fear of Blevins, based on her characterization of only a couple of incidents, is well documented in the record. *See, e.g.* DE #35-8 at 7 (Pegram recalling a time when Blevins "balled up his fists and yelled" at her during a discussion with other students); DE #35-8 at 14 (Pegram recalling that same incident and noting that "[h]e snapped so quickly I was not willing to risk it again to make him mad"); DE #41-12 at 3 (Potts Dep.) ("Ms. Pegram, she, when we had a discussion on the phone she just simply said I'm afraid of Jacob. He's cold."); DE #41-26 (emails from Gamble noting faculty's—ostensibly, Pegram's—fear of physical violence from Blevins once he learned of the "unsafe" grade). Blevins denies any basis for Pegram's unease.

Gamble, with Hubbard present, met with Blevins on March 23, 2017 to discuss the "unsafe" clinical grade. DE #16 (March 23, 2017 Meeting Notes). Pegram missed the meeting, per her testimony, due to illness. DE #35-6 (Pegram Dep.) at 9. The meeting minutes reflect that Gamble explained that Blevins would be receiving an "unsafe" grade in NUR 232C and outlined the factual basis. DE #16. At the close of the meeting, Gamble described the grade appeal process and flagged applicable deadlines (including the course withdrawal deadline, which Blevins would have to observe if he wished to avoid having any grades on his transcript for the Spring 2017 Semester). *Id.* Gamble concluded by walking Blevins to the dean's office and identifying staff that could assist in the grade appeal process. *Id.* Blevins filed his appeal the following day and, after meeting with a faculty member and discussing his appeal paperwork, amended his appeal and submitted a revised letter on March 28, 2017. *See* DE #35-10 (Emails) at 23–24.

On March 31, 2017, Blevins attended a grade appeal hearing before two professors, an associate dean, and one student panel member. DE #35-18 (Short Aff. & March 31, 2017 Hearing Minutes).[12] Pegram and Gamble also attended.[13] *Id.* Blevins had an opportunity to orally challenge the "unsafe" grade, and Pegram outlined her concerns with Blevins's Toradol administration. *Id.* After the hearing, the panel voted (by secret ballot) to uphold Blevins's "unsafe" grade, and Blevins received notice of the appeal decision later that evening. Blevins subsequently appealed his grade further, to both the dean of the program and, later, the University provost. All appeal attempts were ultimately unsuccessful, and Blevins withdrew from Spring 2017 classes on April

---

[12] Just prior to that, Blevins had a meeting with Pegram and Petrey to review the basis for the grade. *See* DE #35-12 (Petrey Dep.) at 7; DE #35-6 (Pegram Dep.) at 9. This was part of EKU's administrative process. Notably, Blevins did not at any point seek to continue the final grade appeal hearing.

[13] Because Gamble delivered the grade and justification to Blevins, she recused from later formal involvement, and Associate Dean Judy Short served as Chair of the March 31 appeal hearing. *See* DE #35-18 at 1.

4, 2017. DE #21 (Withdrawal Form). Blevins cited as the reason for withdrawal the unfortunate death of his father in March of 2017. *Id.* He did not receive a failing grade because of the timely withdrawal. Though Blevins later sought readmission, *see* DE #35-22, EKU denied the request, *see* DE #23.[14]

### C. Current Procedural Status

The Complaint alleges various claims under the Kentucky Constitution against Gamble and Pegram, in both their individual and official capacities, as well as against EKU (Counts I and II), federal due process claims via 42 U.S.C. § 1983 against Gamble and Pegram, individually and officially, and EKU (Counts III and IV), a Title IX gender discrimination claim (Count V), and a First Amendment retaliation claim (under both the federal and Kentucky constitutions) against Gamble and Pegram, individually and officially, and EKU (Count VI). DE #1. Blevins also tries to imbed, within a separate punitive damages count (Count VII), a theory for intentional infliction of emotional distress; he asserts this against all Defendants. *Id.* [15] In response to Defendants' summary judgment motion (DE #35), Plaintiff conceded dismissal of or failure to meet the burden on several claims: (1) the Count IV § 1983 claim against Gamble and Pegram, officially, and EKU;[16] (2) the Count V Title IX claim; and (3) the Count VI retaliation claim. *See* DE #41 at 21, 27. Given Blevins's concession on those claims, the Court grants Defendants' unopposed and well-

---

[14] Per Blevins's testimony, he now attends nursing school at UK. *See* DE #35-9 at 11.

[15] The Court later rejected Plaintiff's incomplete, nonspecific, and legally unsupported attempt to amend the Complaint and add Petrey and Hubbard as Defendants. DE #32.

[16] "To the extent that Plaintiff has asserted claims under 42 U.S.C. § 1983 alleging that the Defendants EKU and the Board of Regents have violated his due process rights under the Fourteenth Amendment, those claims should be dismissed." DE #41 at 27. As the official-capacity claims against Gamble and Pegram are, functionally, claims against EKU as well, Count IV thus fails in full. *See, e.g.*, *Matthews v. Jones*, 35 F.3d 1046, 1049 (6th Cir. 1994) ("A suit against an individual in his official capacity is the equivalent of a suit against the governmental entity.") (citation omitted).

supported, per the record, summary judgment motion as to them. *See Celotex Corp. v. Catrett*, 106 S. Ct. 2548, 2552 (1986) (noting that Rule 56 directs courts to grant summary judgment where the nonmovant fails, in response to a properly supported motion, to produce any evidence on a material element of its claim). The Court addresses each remaining claim in turn.

### 2. Summary Judgment Standard

A court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A reviewing court must construe the evidence and draw all reasonable inferences from the underlying facts in favor of the nonmoving party. *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 106 S. Ct. 1348, 1356 (1986); *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009). Additionally, the court may not "weigh the evidence and determine the truth of the matter" at the summary judgment stage. *Anderson v. Liberty Lobby, Inc.*, 106 S. Ct. 2505, 2511 (1986).

The burden of establishing the absence of a genuine dispute of material fact initially rests with the moving party. *Celotex Corp.*, 106 S. Ct. at 2553 (requiring the moving party to set forth "the basis for its motion, and identify[] those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate an absence of a genuine issue of material fact"); *Lindsay*, 578 F.3d at 414 ("The party moving for summary judgment bears the initial burden of showing that there is no material issue in dispute."). If the moving party meets its burden, the burden then shifts to the nonmoving party to produce "specific facts" showing a "genuine issue" for trial. *Celotex Corp.*, 106. S. Ct. at 2253; *Bass v. Robinson*, 167 F.3d 1041, 1044 (6th Cir. 1999). Indeed, "Rule 56(c) mandates the entry of summary judgment . . . against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden

10

of proof at trial." *Celotex Corp.*, 106 S. Ct. at 2552; *see also id.* at 2557 (Brennan, J., dissenting) ("If the burden of persuasion at trial would be on the *non-moving* party, the party moving for summary judgment may satisfy Rule 56's burden of production in either of two ways. First, the moving party may submit affirmative evidence that negates an essential element of the nonmoving party's claim. Second, the moving party may demonstrate to the Court that the nonmoving party's evidence is insufficient to establish an essential element of the nonmoving party's claim." (emphasis in original)).

A fact is "material" only if the underlying substantive law identifies the fact as critical. *Anderson*, 106 S. Ct. at 2510. Thus, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* A "genuine" issue exists if "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party." *Id.* at 2511; *Matsushita Elec.*, 106 S. Ct. at 1356 ("Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'") (citation omitted). Such evidence must be suitable for admission into evidence at trial. *Salt Lick Bancorp v. FDIC*, 187 F. App'x 428, 444–45 (6th Cir. 2006).

### 3. Analysis

#### i. Kentucky Constitutional Claims

Plaintiff, without factual distinction, asserts violations of §§ 2 and 183 of the Kentucky Constitution.[17] All claims that Blevins brings under the state constitution fail as a matter of law

---

[17] Section 2 provides: "Absolute and arbitrary power over the lives, liberty and property of freemen exists nowhere in a republic, not even in the largest majority." Ky. Const. § 2. This section has traditionally been construed as a due process protection. *Smith v. O'Dea*, 939 S.W.2d 353, 357 (Ky. Ct. App. 1997) ("[T]his guarantee is generally understood as a due process provision whereby Kentucky citizens may be assured of fundamentally fair and unbiased procedures."). Section 183

because the Kentucky Constitution affords no private cause of action for monetary damages, and Blevins seeks no prospective relief. *See St. Luke Hosp., Inc. v. Straub*, 354 S.W.3d 529, 536 (Ky. 2011) (holding that Kentucky recognizes no private right of action for alleged violations of its constitution and declining to create a statutory avenue akin to a federal *Bivens* action); *see also Faul v. Bd. of Educ. of Danville Indep. Sch.*, No. 5:12-CV-277-KSF, 2013 WL 1511746, at *3 (E.D. Ky. Apr. 9, 2013) (dismissing a claim under § 2 of the Kentucky Constitution, based on *St. Luke*, where the plaintiff sought only damages and no injunctive relief); *K.K. by & through J.K. v. Clark Cty. Bd. of Educ.*, No. CV 5:19-005-DCR, 2020 WL 734473, at *7 (E.D. Ky. Feb. 13, 2020) (dismissing, based on *St. Luke*, claims for alleged violations of the Kentucky Constitution because Kentucky recognizes no such private cause of action akin to federal § 1983 or *Bivens* actions). Blevins offers utterly no contrary authority. The Court thus grants Defendants' motion for summary judgment on Counts I and II.

### ii. § 1983 Substantive Due Process Claim

Though Plaintiff generally suggests a substantive claim in the Complaint, he provides no authority or particularized argument supporting such claim in response to Defendants' summary judgment motion.[18] Regardless, to the extent Blevins intends to maintain any federal substantive due process theory in his summary judgment response, it too fails as a matter of law in this case because Blevins has not established any constitutionally protected right to continue his nursing education at EKU. The Sixth Circuit "has recognized that a substantive due process violation occurs when arbitrary and capricious government action deprives an individual of a

---

of the Kentucky Constitution simply provides "for an efficient system of common schools throughout the State." Ky. Const. § 183.

[18] DE #35 only briefly addresses substantive due process, commensurate with Blevins's minimal attention to the topic in the Complaint. *See* DE #35 at 22–23.

constitutionally protected property interest." *Warren v. City of Athens*, 411 F.3d 697, 707 (6th Cir. 2005); *Gutzwiller v. Fenik*, 860 F.2d 1317, 1328 (6th Cir. 1988) ("Substantive due process . . . protects specific fundamental rights of individual freedom and liberty from deprivation at the hands of arbitrary and capricious government action . . . Even if such an interest has been impaired by governmental action, courts will review the challenged decision only for arbitrariness or capriciousness."). Plaintiff thus must demonstrate that "(1) a constitutionally protected property or liberty interest exists, and (2) the constitutionally protected interest has been deprived through arbitrary and capricious action." *Paterek v. Vill. of Armada*, 801 F.3d 630, 648 (6th Cir. 2015) (quoting *Braun v. Ann Arbor Charter Twp.*, 519 F.3d 564, 573 (6th Cir. 2008) (internal quotation marks omitted)).

Critically, the Sixth Circuit has not recognized any substantively protected interest in a student's postsecondary education, absent some corresponding deprivation of an established right (such as an equal protection violation).[19] *See Bell v. Ohio State Univ.*, 351 F.3d 240, 251 (6th Cir. 2003) ("Where . . . there is no equal protection violation, we can see no basis for finding that a medical student's interest in continuing her medical school education is protected by substantive due process."); *Rogers v. Tennessee Bd. of Regents*, 273 F. App'x 458, 463 (6th Cir. 2008) (discussing *Bell* and concluding that "because [the plaintiff's] interest in her nursing education [wa]s not protected by substantive due process, summary judgment was proper on her substantive

---

[19] Plaintiff admits that no evidence supports a gender discrimination or a constitutional retaliation claim, and he drops them voluntarily. Further, though Blevins focuses heavily on Pegram's alleged fear of him, there is no evidence that Pegram's fear precipitated or motivated her final grading decision in any way—all evidence in the record pertaining to Pegram's fear demonstrates that her concern (whether or not reasonable) stemmed from Blevins's potential reaction to an *unsafe* grade. Moreover, there is absolutely no evidence that such fear turned on any constitutionally relevant factor (such as Blevins's gender, race, etc.). Blevins does not pursue any equal protection claim in this case, and the evidence does not support one.

due process claim"); *McGee v. Schoolcraft Cmty. Coll.*, 167 F. App'x 429, 436 (6th Cir. 2006) (finding that the plaintiff had no constitutionally protected substantive due process interest in continuing her postsecondary education); *Doe v. Miami Univ.*, 882 F.3d 579, 598 (6th Cir. 2018) (quoting *Martinson v. Regents of Univ. of Mich.*, 562 Fed.Appx. 365, 375 (6th Cir. 2014)) (observing that "the Supreme Court never has held that the interest in continued education at a public university constitutes a fundamental property or liberty interest that finds refuge in the substantive protections of the Due Process Clause[]" and, rather, "precedent suggests that the opposite is true").

Blevins does not address these cases and offers no contra authority; nor does he provide any basis, on these facts, for finding a constitutionally protected substantive due process interest in continuation of his nursing education at EKU, where he alleges no equal protection or similar violation. Accordingly, summary judgment is proper on this factually and legally unsubstantiated claim.[20]

---

[20] Some courts, it appears, analyze the protected-interest and arbitrary-and-capricious prongs in the disjunctive rather than conjunctive, contemplating either as sufficient to demonstrate a substantive due process violation. *See, e.g.*, *Valot v. Se. Local Sch. Dist. Bd. of Educ.*, 107 F.3d 1220, 1228 (6th Cir. 1997) ("Substantive due process claims may be loosely divided into two categories: (1) deprivations of a particular constitutional guarantee; and (2) actions that shock the conscience . . . Where government action does not deprive a plaintiff of a particular constitutional guarantee or shock the conscience, that action survives the scythe of substantive due process so long as it is rationally related to a legitimate state interest.") (internal quotation marks and citations omitted); *Martinson*, 562 F. App'x at 375 (concluding, based on *Bell*, that the plaintiff had established no protected right in a continued nursing education but nevertheless briefly analyzing whether the school's action was arbitrary and capricious, and concluding that it was not); *Doe v. Miami Univ.*, 882 F.3d 579, 598–99 (6th Cir. 2018) (finding that the plaintiff "ha[d] not sufficiently pleaded a substantive-due-process claim premised on a deprivation of a constitutionally protected guarantee[]" but proceeding to separately analyze whether the defendants' conduct was arbitrary and capricious, *i.e.*, whether it "shock[ed] the conscience"). Other courts end the analysis upon finding the absence of any protected right. *See, e.g.*, *Rogers*, 273 F. App'x at 463; *McGee*, 167 F. App'x at 437 ("Plaintiff has not alleged any equal protection violation. The interest she asserts is virtually identical to the one asserted in *Bell* which was rejected as a basis for a substantive due process claim . . . Consequently, SCC is entitled to judgment as a matter of law to the extent that

### iii. § 1983 Procedural Due Process Claim

To maintain a § 1983 procedural due process claim, a plaintiff must demonstrate: (1) a constitutionally protected life, liberty, or property interest; (2) deprivation of that protected interest within the meaning of the Due Process Clause; and (3) that the state failed to provide adequate procedural protections before depriving the plaintiff of the protected right. *Hahn v. Star Bank*, 190 F.3d 708, 716 (6th Cir. 1999); *accord Women's Med. Prof'l Corp. v. Baird*, 438 F.3d 595, 611 (6th Cir. 2006). However, Blevins must clear the additional hurdle of overcoming Defendants' asserted qualified immunity defense to avoid summary judgment.[21] "[A] two-part test [ ] determines whether qualified immunity applies: '(1) whether, considering the allegations in a light most favorable to the party injured, a constitutional right has been violated, and (2) whether that right

---

the complaint asserts a substantive due process claim."). Given Plaintiff's failure to address the legal standard (or, indeed, provide any legal authority) for a substantive due process claim in this context, the Court does not exhaustively analyze the unbriefed and unsupported theory. Still, the Court comments that Pegram's and Gamble's conduct in this case does not, per the record, rise to the level of constitutionally conscience-shocking or arbitrary and capricious behavior. *See, e.g.*, *Handy-Clay v. City of Memphis, Tenn.*, 695 F.3d 531, 547–48 (6th Cir. 2012) (noting that "this characterization applies to only the most egregious official conduct . . . conduct that is so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency") (internal quotation marks and citations omitted); *Upsher v. Grosse Pointe Pub. Sch. Sys.*, 285 F.3d 448, 453 (6th Cir. 2002) ("[A] plaintiff must prove either intentional injury or arbitrary conduct intentionally designed to punish someone—*e.g.*, giving a worker a particularly dangerous assignment in retaliation for a political speech . . . or because of his or her gender.") (internal quotation marks and citations omitted); *Flaim v. Med. Coll. of Ohio*, 418 F.3d 629, 643 (6th Cir. 2005) (characterizing *Dixon v. Alabama State Bd. of Ed.*, 294 F.2d 150, 157 (5th Cir. 1961), in which two African-American students "were expelled for seeking to purchase lunch at a publicly owned grill in the basement of the Montgomery, Alabama, county courthouse" as emblematic of a conscience-shocking substantive due process violation). Pegram and Gamble certainly have rational, legitimate interests in imposing and enforcing stringent requirements on student clinicians in the healthcare setting, mandating strict adherence to medication instructions, and exercising professional discretion in judging student performance and preventing continued clinical participation where students fall below an instructor's standards.

[21] Once a defendant raises the defense of qualified immunity, the plaintiff bears the burden of overcoming it and establishing that the defendant is not entitled to qualified immunity. *See Johnson v. Moseley*, 790 F.3d 649, 653 (6th Cir. 2015).

was clearly established.'" *Doe*, 882 F.3d at 604 (quoting *Heyne v. Metro. Nashville Pub. Sch.*, 655 F.3d 556, 562 (6th Cir. 2011) (citation omitted)). "These two prongs may be addressed in any order[,]" and, "[i]f either prong is not met, then the government officer is entitled to qualified immunity." *Id.* "A right is clearly established if '[t]he contours of that right [are] sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Goodwin v. City of Painesville*, 781 F.3d 314, 325 (6th Cir. 2015) (quoting *Wheeler v. City of Lansing*, 660 F.3d 931, 938 (6th Cir. 2011)).

Assuming that Blevins has a constitutionally recognized property interest, protected by procedural due process, in continued enrollment in EKU's nursing program,[22] there is no authority establishing (clearly or otherwise) that the process afforded him by Pegram and Gamble violated such a right. The claims at issue in this case are those against Pegram and Gamble, individually. Pegram issued and Gamble communicated the "unsafe" grade. Other than as a witness or attendants, neither was part of the final administrative or appeal process result at EKU. Thus, they

---

[22] The absence of a substantive due process right does not preclude existence of a procedural due process right. *See, e.g.*, *McGee*, 167 F. App'x at 437 (quoting *Bell*, 351 F.3d at 249–50) ("The fact that Plaintiff has not demonstrated such an interest in the context of her substantive due process claim does not necessarily doom her procedural claim as well. Although establishing a protectable interest is a common element of both kinds of due process claims, '[t]he interests protected by substantive due process are of course much narrower than those protected by procedural due process.'"). At minimum, it is clear that, when a student is subject to *disciplinary* sanctions, he is entitled to procedural due process protections. *J. Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 297 (6th Cir. 2019) ("Indeed, we have repeatedly held that a state-university student facing a significant disciplinary decision, such as expulsion, is entitled to minimum due process protections.") (internal quotation marks and citations omitted). Here—as discussed *infra*—Blevins's "unsafe" clinical grade was academic, rather than disciplinary in nature. Assuming that Kentucky law vests in Blevins a property interest in continued EKU enrollment in this academic context, and applying the considerably less robust procedural requirements applicable here, there is no authority establishing that Pegram and Gamble did not provide Blevins the (minimal) process due. *See, e.g., Hill v. Univ. of Kentucky*, 978 F.2d 1258 (6th Cir. 1992) (assuming, without deciding, that procedural due process protected the plaintiff's interest and applying the minimal "careful and deliberate" standard to the school's academic decision).

made or transmitted a provisional determination, and Blevins then had access to a full appellate process involving persons not before the Court as parties. Ultimately, Blevins withdrew from EKU post-appeal, but he did not cite the grade as the reason for the withdrawal. In this context—where a professor's academic judgment began a chain of events ultimately (though perhaps not causally) ending in withdrawal—Blevins has cited no cases clearly defining a procedural due process right that Pegram and/or Gamble arguably violated.

Again, the Court assesses only the conduct of the persons before the Court—here, Pegram (the clinical instructor, who gave the grade) and Gamble (the program chair, who communicated the grade and facilitated the appeal process). Because the "unsafe" clinical grade was an academic assessment based on conduct within clinic, as part of a course rotation, the Court views it under the procedural rubric that applies to academic judgments.[23] "The Supreme Court has recognized a critical distinction between dismissals for disciplinary misconduct and dismissals for academic underperformance." *J. Endres*, 938 F.3d at 297 (contrasting *Goss v. Lopez*, 95 S. Ct. 729 (1975) with *Horowitz*, 98 S. Ct. 948). "When a school imposes a serious sanction like dismissal to address a student's disciplinary misconduct, the student is entitled to more robust process, including a hearing" and attendant opportunity to be meaningfully heard. *Id.* In contrast, a student facing

_____

[23] "[T]he purpose of [an academic] inquiry is not to answer an objective question about the student's conduct. Rather . . . [it] requires a subjective, expert evaluation as to whether [the student's] performance satisfies some predetermined standard of academic competence, which itself is set by a similarly expert judgment." *J. Endres*, 938 F.3d at 301 (quoting *Bd. of Curators of Univ. of Missouri v. Horowitz*, 98 S. Ct. 948, 954 (1978)) (internal quotation marks omitted). "This contrasts with a disciplinary inquiry, 'which requires a factual determination as to whether the conduct took place or not' and thus warrants more rigorous protections under the Due Process Clause." *Id.* (internal quotation marks and citation omitted). The "unsafe" grade here was the result of Pegram's academic assessment of Blevins's clinical skills and her application of professional judgment. And, Gamble did not (nor did any other EKU administrator) engage in further factfinding regarding the Toradol incident. Indeed, Blevins concedes that this situation involves an academic decision. *See* DE #41 at 33.

dismissal on academic grounds is entitled only to "notice of his unsatisfactory academic performance and [ ] a 'careful and deliberate' decision[]" on the matter; "the university need not provide a hearing." *Id.* at 298 (quoting *Ku v. Tennessee*, 322 F.3d 431, 436 (6th Cir. 2003)).

This forgiving rubric assures wide latitude for decisions about matters of scholarship. As the Supreme Court long ago noted, decisions in academia come from an environment markedly different from the objective decisions of disciplinary boards. *See, e.g., Horowitz*, 98 S. Ct. at 953 (discussing "the significant difference between the failure of a student to meet academic standards and the violation by a student of valid rules of conduct[]" and correspondingly different process required for each). Faculty decisions, like grading, plumb matters subjective, evaluative, and often collaborative. The classroom (or training clinic) are not the courtroom, and college faculty rightly get leeway when judging the merits of a student qua student. The Court is loath to open and meddle in the grade ledger. Blevins does have rights, but the procedural due process bar is at its lowest in this academic context. As long as Pegram and Gamble communicated the grade basis and reached their decisions in ways careful and deliberate, Blevins received the process due him under the Constitution. The Court does not decide the rectitude or accuracy of Pegram's unsafe characterization, but only queries the manner by which she reached it.[24]

There is no evidence persuasively (or triably) suggesting that Pegram concocted the events in clinic. Blevins admits he was told to do a slow push on the Toradol. Pegram describes what that should have meant under EKU's training protocols, as she understood them. Blevins admits both

---

[24] As an initial matter, the Court notes that Blevins spends many pages poring over EKU's compliance with university rules. Those rules do not, however, themselves set the boundaries of federal due process. *See, e.g., Doe*, 882 F.3d at 603 (6th Cir. 2018) (noting that "a mere failure by the University to follow its own internal guidelines does not give rise to a procedural-due-process violation"); *Doe v. Cummins*, 662 F. App'x 437, 445 n.2 (6th Cir. 2016) ("[T]he Constitution—and the case law interpreting it—mandates what procedures are constitutionally required following the deprivation of a property or liberty interest, and not internal school rules or policies[.]").

that he pushed faster than intended and that the patient expressed pain. *See* DE #35-9 (Blevins Dep.) at 12 ("You're pushing slowly . . . So I'm counting in my head, and bam, six seconds is done."); *id.* at 8 (recalling that W.M. "said, 'Ouch, that burns a little bit.'"); *see also* DE #1 (Complaint) at ¶ 16 (stating Blevins's knowledge, before administering the Toradol, that an "extended 'push' [was] required"); *id.* (alleging that "[t]he patient indicated that the medication burned"). This generally aligns with Pegram's overall subjective critique.

Per the record, Pegram's handling arguably was not perfect, and the Court accepts as true, for analysis, the imperfections Blevins decries. Thus, the patient and his family cut against some of Pegram's characterizations. *See* DE ##41-19, 41-20. The UK nurses mostly do not corroborate what Pegram claims to have done after the event, and they raise questions about the EKU medication protocol. *See* DE ##41-8, 41-9, 41-10, 41-11. Pegram herself, in her deposition testimony, vacillated at times over the various standards—the EKU "unsafe" definition, the general standard of care, and the student standard of care.

One thing is clear and unchanging, though. Pegram directed a slow medication push, and she perceived Blevins to have ignored her direction. She may or may not have implored him to slow down during the push—that is disputed—but Blevins knew going in that the push was to be slow. Thus, a rapid push (and certainly, despite no stopwatch, all agree the push happened in just a few seconds—a six-count, per Blevins) violated Pegram's directions. As a professional, she was entitled to view a student nurse that disregards instructions on the administration of medication as creating risk and failing to meet the standard of a prudent nursing student. That is the definition of "unsafe" per EKU policies. Pegram interpreted the full scenario—as she fairly perceived it, a disobedient student acting in a way that inflicted (minor) pain on a patient, and, more critically,

19

creating potential for harm by noncompliance with or resistance to supervision—and had instant concerns.

However, Pegram did not make a snap decision. Burdened by the event, she collaborated with the entirety of her clinical group, the coordinator, and her department chair. She accepted input and advice from each. The decision was Pegram's, but the process of consultation with other faculty shows care and deliberation in reaching the grade. The nursing coordinator agreed that if Pegram saw the matter as unsafe, in her judgment, the grade should be unsafe. *See* DE #35-12 (Petrey Dep.) at 6 ("And in my recollection I remember saying do you consider this to be an unsafe behavior? And she said, yes, it is. And then I said then you have your answer. If it's unsafe to you as a nurse, then it's unsafe."). Chair Gamble had a similar analysis, per her testimony in this case. *See* DE #41-2 (Gamble Dep.) at 2 ("I would say that Ms. Pegram as the faculty of record in her judgment identified Mr. Blevins to be unsafe in clinical performance. And so that is the grade that was earned by the student in the opinion of the faculty of record."). Pegram and colleague Hubbard walked together through the applicable standard. *See* DE #35-8 (Pegram Dep.) at 10 ("[Hubbard] explained it to me as if a student does not follow clinical instruction that they are clinically unsafe."); DE #35-13 (Hubbard Dep.) at 4 ("Because I had been there for a longer period of time than Ms. Pegram, and there had been issues that she was concerned about with [Blevins] in clinical, she asked me to be with her to listen to what the concerns were and just to help her to decide, not decide, help her to develop whatever document she was going to because she was new faculty and had not had the experience of giving anything but a satisfactory . . . Based on what [Pegram] said, then she would make the decision of what to do with that event. But I just talked her through this is the policy, this is what we have, it's now your decision, did this fit this criteria or that criteria.

So it was someone to help be a sounding board."). The consultative steps, which involved other faculty both familiar with and removed from Blevins, signify real process.

The written grade has areas for debate and doubt. The family's reaction and Blevins's post-event attitude are disputed issues. Also, the grade description includes significant background information not directly tied to the March 20 incident. The Court, though, thinks it logical for a faculty member assessing precipitating student conduct to consider the full record. *See, e.g.*, *Al-Dabagh v. Case W. Reserve Univ.*, 777 F.3d 355, 360 (6th Cir. 2015) ("We repeatedly have emphasized that academic evaluations may permissibly extend beyond raw grades [and] other objective criteria.") (internal quotation marks and citation omitted); *Yoder v. Univ. of Louisville*, 526 F. App'x 537, 550 (6th Cir. 2013). If Pegram had negative impressions of Blevins's attitude, responsiveness to instruction, and interactive skills, those views could rationally inform her perception of Blevins on the date of the pediatrics rotation. Again, accounting for the full record is a deliberative sign.

As for Chair Gamble, the Court is unpersuaded by the many criticisms. Again, the lens is singular—did Gamble violated Blevins's due process rights? Did she fail to communicate the grade and did she fail, in the limits of her role, in reaching a careful and deliberate decision? Gamble had met with Blevins before, over communications concerns with Pegram. *See* DE #41-25 (Gamble's March 7, 2017 Meeting Notes). Because Pegram was out after the March 20 rotation, Gamble stood in for her and timely communicated to Blevins the basis for the "unsafe." DE #35-16 (Gamble's March 23, 2017 Meeting Notes). She, as part of that meeting, covered all appeal and other options and walked Blevins down to the office that would initiate the appeal. *Id.* Outside of consulting with Pegram as a junior faculty member and facilitating broader faculty input, acts that contributed to the sober decisional process, Gamble played no other direct role.

21

Blevins faults Gamble for not launching a searching inquiry and for not volunteering all she may (or could) have known during the grade appeal. It seems that she attended that appeal only at Blevins's request. Precisely what she knew from UK at the time is not clear, but whether Pegram did or did not make a formal report to UK is not a key to the unsafe grade. Critically, the UK reporting threshold and the EKU unsafe measures may or may not meaningfully intersect; that is not clear, not decided in the Blevins appeal record, and not in any way determinative. EKU personnel had their view of the push propriety and the impact of Blevins's behavior on his status as a safe EKU nursing student. No one claimed that Blevins's patient, other than feeling pain, suffered a cognizable injury. As is clear from the record, the focus, by Pegram and in the written grade, was on the fact that Blevins violated the instructions of his managing medical supervisor. This was a professional judgment by nursing faculty at EKU. The views at UK are interesting as a debate point but do not undercut the procedural result down the road in Richmond.

Ultimately, Blevins points to no case of this nature that would cast the roles of Pegram[25] and Gamble as unconstitutional. His marginal criticisms flyspeck the process at EKU, but neither defendant had to act perfectly to act within the broad range of process due in academics. Each showed care and deliberation in her role, and each was only a distinct part of what ended up being

---

[25] The Court rejects the argument that Pegram's fear affected the process. As noted, Pegram testified that, if anything, fear would have led her to avoid an "unsafe" grade and keep Blevins in the program. *See* DE #35-6 (Pegram Dep.) at 4 ("I would think it would be teachable only because I was scared to death to kick him out of the program[,] to mark him unsafe[,] [that] would be the only reason I would do a teachable moment . . . I was terrified to the point I quit my job, sold my house."); *id.* at 3 ("Not because I necessarily thought it would be as teachable. I was more concerned about the harm it would cause by doing an unsafe . . . I was worried about Jacob Blevins's reaction to an unsafe . . . I was scared of him."). Blevins points to no proof challenging this testimony or suggesting that Pegram's fear of him in any way impacted the March 20 events or subsequent grading decision. Plaintiff's assertion that Pegram graded him as she did because of fear amounts to rank speculation and does not assail the Court's evaluation of the decisional process.

a full and neutral appellate process at EKU. Certainly, the faculty defendants exercised professional judgment, and with no case validly calling that into question, Blevins's procedural claim fails. *See Ewing*, 106 S. Ct. at 513 (providing that judges "may not override [an academic decision] unless it is such a substantial departure from accepted academic norms as to demonstrate that the person or committee responsible did not actually exercise professional judgment"); *Yoder*, 526 F. App'x at 551 (concluding, where the defendants conferred with one another concerning the grounds for student dismissal, explained the dismissal basis to the student, and provided for an appeal process, that "it was not objectively unreasonable for Defendants to have believed that they provided Yoder with adequate due process procedures for an academic dismissal, and accordingly they are entitled to qualified immunity[]"); *Rogers*, 273 F. App'x at 463 (finding the decision-making process "careful and deliberate" where the student received notice and explanation of her grade, as well as a grade appeal process). If Blevins had authority showing that faculty acting in the roles depicted would have transgressed a clearly established right, he should have touted it in briefing.[26] Plaintiff's merits brief cites nary a case, in the qualified immunity rubric, clearly defining Defendants' behavior as violative of due process, and summary judgment on the procedural due process claim thus is apt.

---

[26] As the Sixth Circuit has defined it many times, "[f]or a right to be clearly established, the contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Holzemer v. City of Memphis*, 621 F.3d 512, 527 (6th Cir. 2010) (quoting *Leonard v. Robinson,* 477 F.3d 347, 355 (6th Cir. 2007) (citation and internal quotation marks omitted)). In other words, "in light of pre-existing law the unlawfulness must be apparent." *Id.* (quotation marks and citation omitted). Though the cases "do not require a prior, precise situation, . . . a finding that the very action in question has previously been held unlawful, . . . or a case directly on point[,] . . . there must either be controlling authority or a robust consensus of cases of persuasive authority." *Guertin v. State*, 912 F.3d 907, 932 (6th Cir. 2019) (internal quotation marks and citations omitted). With no comparative cases—certainly nothing controlling and no consensus of persuasive law on the topic—and with ample indication that the faculty members actually exercised professional judgment and did so in a careful and deliberate manner, qualified immunity protects the Defendants here.

### iii.    IIED Claim and Punitive Damages Request[27]

As Defendants note, the Complaint does not clearly articulate a distinct IIED claim, though Plaintiff (perfunctorily) addresses one in his response. As a threshold matter, insofar as Plaintiff asserts this claim against EKU (and Gamble and Pegram in their official capacities), sovereign immunity bars it under Kentucky law; Plaintiff has identified no immunity waiver applicable in this context, and the Court is aware of none. *See, e.g., Campbell v. Univ. of Louisville*, 862 F. Supp. 2d 578, 585 (W.D. Ky. 2012) (collecting cases dismissing state law tort claims on sovereign immunity grounds). Moreover, Plaintiff fails to establish (or even argue) any facts concerning critical IIED elements. To succeed on a claim of IIED: "1) the wrongdoer's conduct must be intentional or reckless; 2) the conduct must be outrageous and intolerable in that it offends against the generally accepted standards of decency and morality; 3) there must be a causal connection between the wrongdoer's conduct and the emotional distress; and 4) the emotional distress must be severe." *Burgess v. Taylor*, 44 S.W.3d 806, 811 (Ky. Ct. App. 2001).

Blevins has not alleged, much less demonstrated, any severe emotional distress (or resulting damages) in this case. Neither the evidence in the record, nor Blevins's briefing, meaningfully addresses this claim or develops any emotional distress theory. As courts, and this Circuit, have repeatedly recognized, "[i]ssues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived. It is not sufficient for a party to mention a possible argument in the most skeletal way, leaving the court to . . . put flesh on its bones." *McPherson v. Kelsey*, 125 F.3d 989, 995–96 (6th Cir. 1997) (citation omitted). With no proof (or legitimate advocacy) on the IIED topic, the Court grants summary judgment. Blevins

---

[27] The Court, exercising supplemental jurisdiction over this state law claim, applies Kentucky law. *See, e.g.*, *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 741 (6th Cir. 1999).

cites no evidence supporting necessary elements of the claim the defense shows are missing. *See* DE #43-1 (Plaintiff's Rule 26 and Supplemental Disclosures) at 7–8 (listing damages and omitting any reference to emotional distress or severe emotional distress). Indeed, the record includes no witness or document in support of the required severe distress element. Accordingly, as no independent state law tort claim survives, the Court likewise rejects the companion request for punitive damages. *See, e.g.*, *Price v. AgriLogic Ins. Servs.*, LLC, 37 F. Supp. 3d 885, 901 (E.D. Ky. 2014) (citing *Shibeshi v. Alice Lloyd Coll.*, No. 11-cv-101-ART, 2011 WL 4970781 at *5 (E.D. Ky. Oct. 19, 2011) (reiterating that a claim for punitive damages is not an independent cause of action).

### 4.  Conclusion

For the reasons discussed, the Court **GRANTS** Defendants' motion for summary judgment (DE #35) as to all claims. A corresponding Judgment follows.

This the 5th day of March, 2020.

Signed By:

*Robert E. Wier*

**United States District Judge**